Please be seated. All right, let me fire this up first. Everybody's ready? Let's call 22-3276 United States v. Hay, Ms. Tennell. Good morning, Your Honors, and may it please the Court, Rachel Tennell appearing on behalf of Appellant Mr. Bruce Hay. I would like to start with issue number three in this case, which is the 68-day warrantless poll camera surveillance of Mr. Hay's home. But if the After having investigated and surveyed Mr. Hay for three years in order to get a good idea of his movements and abilities and to learn about Mr. Hay's routines, the government installed a motion-activated camera across the street from Mr. Hay's home in order to surreptitiously capture as much of his everyday non-criminal activity as possible for an intended-to-capture-a-day-in-the-life of Mr. Hay. The government recorded over a thousand hours of footage, capturing nearly ten weeks of surveillance. The poll camera had a clear view of the entire front of Mr. Hay's home, including the six windows that line the front of his home, the front door, the front porch, and the driveway where his cars were parked. This government surveillance created a detailed, comprehensive, live and historical record of Mr. Hay's life for over two months. It showed his familial and personal associations and patterns. The surveillance was more than any nosy neighbor could have seen. Do we have, is there any evidence of his subjective belief that his conduct invaded his privacy interests? So no court has ever asserted that a person must make affirmative steps to create a subjective expectation of privacy, especially when it comes to their home, which is first among equals when it comes to the Fourth Amendment. I guess we have to assume that, don't we, under the test the Supreme Court's articulated in Carpenter and the other cases. And then we have to credit that belief in privacy as something that objectively society would credit, right? That's correct, Your Honor. And here, Mr. Hay was actually prohibited by local ordinance laws from putting up a fence over four feet in front of his home. And this camera was mounted atop a tripod on a high school, presumably above what a four-foot fence would be able to shield. And so, to Your Honor's point, the surveillance here violated the CAPS test for three reasons. One, the area surveilled. Two, the technology used. And three, the cumulative nature of the surveillance. The first prong is easy, as Your Honor just said. The area surveilled here was Mr. Hay's home and his curtilage, an area that is first among equals when it comes to Fourth Amendment protections. Second, the technology that was used here was a camera mounted on a tripod atop a high school, just 200 feet from Mr. Hay's home. As you can see from page 46 of the government's brief, this camera was able to pick up a nearly clear image of the entirety of the front of Mr. Hay's home. The camera here was also cheaper to use than other traditional means of surveillance because the government did not have to pay for the tools or labor costs for individuals to sit there and survey Mr. Hay. They didn't have to pay for lunch breaks. So would that have been okay? Could they have just had a rotating group of agents sitting on top of the school with some binoculars looking at his house? And yes, they could have done that. And actually, they did do that for three years prior to mounting the poll camera. But that wasn't enough for them. They had to mount the poll evidence to prove their allegations. Okay, let me ask you this. So we have U.S. v. Jackson, and your position is that it was, I guess you would say, implicitly overruled by Carpenter? Is that fair? Well, actually, no, Your Honor. Jackson doesn't bind this court for a few reasons. One, it's not binding appellate precedent under the standard announced in Davis v. United States at the Supreme Court because Davis held that you can't have good faith when precedent specifically authorizes a particular police practice. And so when a particular police practice is unsettled, that opens the door for this to be unconstitutional. And that's for a few important reasons. The first one shows that there were two cameras used in Jackson. They were both mounted on utility poles. One surveyed another person's house entirely, so we can disregard that for our analysis. The other focused on public streets and the public sidewalk, and only captured a sliver of Ms. Jackson's front porch, and that was only mounted for one month. Here we're talking about a camera that was mounted for more than double the time, and that captured the entirety of the front of Mr. Hayes' home, not just the sliver of his front porch. Okay, so your opinion is that Jackson is, among other things, factually distinguishable. That's correct, Your Honor. And I thought I read that your position was that the Supreme Court, that Carpenter had overruled it or abrogated it. That is correct, Your Honor. So Jackson was decided in 2000, as this Court knows, and we're talking about a case that is now 23 years after Jackson. And so the Jackson Court did not have the benefit of the Supreme Court's decisions in Kylo in 2001, in Jones in 2012, and in Carpenter in 2018. And so the Jackson Court did not have this fundamental Supreme Court jurisprudence that describes what is protected under the Fourth Amendment, and what is protected, particularly when we're talking about a home, and when we're talking about cartilage, and then when we're talking about a cumulative duration of surveillance. We're all grappling with the technology in our lives and how that changes some of these analysis. I have a neighbor that lives across the street from me, and she's not a nosy neighbor, but she does have a door cam. And so, and her door cam captures my front yard cartilage, and so 24-7 she can spy on me if she wants. And I know it's different when it's the police, but what does that do to our expectations of privacy when cameras are ubiquitous in my neighborhood? I understand you can't walk around London without being monitored continuously by cameras. How do we factor that into what you're asking us to decide? Is there a limiting principle there that we can figure out? I mean, was one week, would this have been okay for a week or two days? And when did it become unconstitutional? How can this court write an opinion that kind of advances the argument that you're making? Because we're going to have to say this is too much, but we'll have to explain why it's too much. Right, Your Honor. And just to start answering your question, ring cameras are something different. So ring cameras are meant to protect that particular home. They're not meant to survey your neighbors. And when we're talking about private surveillance, that's different from government surveillance, as Your Honor stated. And to your second question, this court doesn't need to actually draw a temporal line. What this court can do is rule on the facts and circumstances of this individual case, which would give guidance to law enforcement in this circuit, because they would know that 68 days of surveillance of the entirety of an individual's home, along with, and of course this is not actually in dispute in our case, the three years of prior, more traditional means of surveillance, creating a mosaic effect of an individual's life would be a violation of the Fourth Amendment. The mosaic theory, that would be a bit of a new innovation, a new principle in this area, wouldn't it? Well, courts have grappled with this, and courts have differed in their outcome. And so the First Circuit had a plurality opinion. Some judges agreed that the mosaic theory should apply. Others disagreed. And in Tuggle, in Seventh Circuit, the Seventh Circuit didn't want to apply the mosaic theory. But what's important also to note about the difference between this case and Tuggle is that in Tuggle, the front door wasn't actually on surveillance the way it was here. And in Moore Bush, in the First Circuit, the front door wasn't even visible. So we're talking about a level of surveillance that was more than any other circuit has had to grapple with. And that is important for this court's analysis. Does it matter here that the camera was stationary with one view and not something that, because once he left the curtilage of his home, the cameras, there weren't other cameras following him? So does it matter here that, like Carpenter had lots of movement, it was tracking, right? Correct. Here we're just one spot. Well, actually, Your Honor, the government did follow him when he left his home. No, I know they followed him, but you said that's okay. Correct. Right. We're talking, they didn't have like, Judge Timkovich was talking about a series of cameras that would capture his every move all day long, showing where he went hour by hour, place by place. Correct. And that was sort of, seemed to me, an instrumental part of Carpenter, and that's not present here. Does that matter? Of course it matters, Your Honor, but we're talking about a different situation. So Carpenter was obviously dealing with cell site information, ping a cell phone anywhere that cell phone went in the public. But now we're talking about the home, which is a particularly sensitive area when it comes to the Fourth Amendment, and so that should be part of this Court's analysis when determining whether this was a search. And it also created a mosaic effect of Mr. Hayes' familial and personal associations. This camera was able to see every time Mr. Hayes or anyone in his family, for that matter, stepped outside of their front door. What Mr. Hayes did with his children and his grandchildren in the front yard when he and his wife had presumed moments of solace on their front porch, who visited Mr. Hayes, when they visited, how long they visited, and how frequently they visited. This camera actually created a detailed and comprehensive live and historical view of an area that is particularly protected under the Fourth Amendment. And with the Court's permission, I'd like to reserve the remainder of my time for rebuttal. May it please the Court. Kevin Barber for the United States. So if I could, I'd like to begin with my friend, Mr. Tanel's, attempts to distinguish this Court's decision on the Jackson case, because I think that's a key issue. First of all, I think all of these factual attempts to distinguish Jackson come too late, because Mr. Hayes didn't attempt to distinguish that case in the district court. He argued only that Carpenter has abrogated the Jackson decision. But I also think that these factual distinctions lack merit on their own. First, Mr. Hayes tried to contend in his opening brief that the camera here could see inside the house. I think we've debunked that. The only glimpses inside the house were brief, indistinct glimpses of the entryway. He tried to contend that the camera in Jackson couldn't be remote controlled. Jackson itself says that that camera could be. I think there were some other factual distinctions in the reply brief that were made. And then here today, my friend referred to briefing in the Jackson case about how the Jackson camera could only see a sliver of the defendant's home in Jackson, and that the camera was used for a more limited period of time than the one here. But the important thing is that those distinctions didn't make it into this court's opinion. This court decided Jackson on a broader principle, working off of Supreme Court precedent, clearly approving the visual observation of the home, even for extended periods. Kelo gets into that. It explains why, obviously, the traditional trespassory understanding of the Fourth Amendment isn't violated by that kind of surveillance, and why that surveillance survived the advent of the reasonable expectation of privacy tests. So we think that all of these efforts to distinguish Jackson fail and come too late in the day anyway, and Jackson continues to bind this court. And then for the reasons we've explained in our brief, Carpenter did not undermine Jackson, let alone abrogate it clearly and plucidly, as this court's precedents require. What would it do to your case if Mr. Hay had an eight-foot fence built in front of his house, or a tall hedge, or a line of trees attempting to block the view of his house? What would your position be then? So, Judge Carson, it would certainly make it a tougher case for us. So first of all, that would be a manifestation of a subjective expectation of privacy, which we don't have here, as Judge Tinkovich was discussing with my friend. And there would be definitely a different analysis of the objective reasonableness of such an expectation of privacy. Here, for the reasons we've been discussing, there's no objectively reasonable expectation that the front of your home, which is intended to be on public display, and everybody knows it's on public display at all times, is meant to be private. Well, I'm intrigued by the idea that there was an ordinance that prevented the building of a fence that would be sufficiently private to keep people from seeing within. What do you think about that? Yes, I think that's very helpful to us because it shows that there is no sort of social consensus that the front of the home is a private space. If you have jurisdictions all across America saying that, and these are democratically approved ordinances, saying that people can't construct fences like that, that shows that there is no such expectation as reasonable. All I'm saying on the subjective front is that if Mr. Hay had at least built the four-foot fence or put up some bushes or some trees, that would at least evince some kind of subjective expectation that the front of the house was not meant to be on display. We don't have anything like that here. The photograph in our brief shows that quite clearly. But I think that there are cases like the Tafoya case from the state Supreme Court, the Cuevas-Sanchez case from the Fifth Circuit, where you did have defendants who had fences and then a pole camera was used to look over the fence. And those are very different cases. I don't know if I would be up here conceding that there's been a search even in those cases when we have Supreme Court precedent saying that you can fly an airplane over somebody's house and that's not a search, even though that would be obviously like a pole camera on steroids. It doesn't hover up there. So I'm not conceding that. Although a drone could these days. Yeah, or a drone. You could set one up 24-7 over the backyard. I think drones present interesting issues as well, or the ring camera issue. But we're not dealing with those issues here. I think we're dealing with essentially the exact rule that this court set down in the Jackson case. Well, I think, do we have a case that has this kind of temporal intrusion? I mean, we're talking about 10 weeks. Is it the government's position that the length of the surveillance can never create a privacy violation? I'm not sure. A couple years, this guy was being followed around for three or four years. If this pole camera is up, is there any time limit in your view? There may well be, Judge Cimprovich, but I would definitely still be defending this pole camera, even if it had been up for at least somewhat longer. For example, if you look to the Tuggle case, that camera was up for 18 months and the Seventh Circuit still upheld that warrantless use of the pole camera in that case. So I would still be defending it. There may well be an upper limit. I think that resource constraints and other practicalities foreclose the idea that we would be leaving a pole camera up for extremely long periods of time. But if there were a very complex case, a huge drug conspiracy out of a heavily guarded compound or something like that, and we did need to leave a pole camera up for two years or something like that, then I think it's very plausible that the principles that we've been discussing would permit that to take place, at least under the Fourth Amendment. I mean, there are other I think it was important for law enforcement in this case to be able to have an extended period of surveillance of Mr. Hay so that when it came time to indict him and to bring him to trial, he couldn't come forward. And he essentially did try to do this at his trial, but he couldn't persuasively argue to the jury, you know, the government just caught me on a good day. They were surveilling me for a few days, but my conversion disorder wasn't manifesting at that time. And so, you know, I should be acquitted on that basis. We needed an extended period of surveillance. And I think that is permissible. And the Jackson case, as I said before, doesn't factor in those kinds of temporal concerns. It applies Supreme Court precedent to apply a broader rule that this kind of surveillance does not raise a Fourth Amendment concern. But the other thing I would say, just to tie this up, unless the court has further questions, I do think it would be helpful if the court also clarified in the alternative that the good faith exception would apply. So basically reaffirm that remains sound precedent even after Carpenter. There was no objective, objectively reasonable expectation of privacy here, but also that the good faith exception would apply in any event. I think that would put the court's decision on the strongest possible footing. What's your, how do you distinguish Carpenter? Is it the movement of the vehicle or is it the pattern of the information that generated? What's, why is it distinguishable? I think the core distinction is the all-encompassing record, at least this is how the Supreme Court understood the technology in that case, the all-encompassing record of everywhere that the defendant goes for an extended period of time. Supreme Court viewed that as raising special concerns along the lines that were raised by some of the concurring opinions in the Jones case. If you know everywhere that there's an intimate interest, a very different kind from the sort of behavior that you put on display at the front of your house. I know that in some ways isn't this more intrusive in Carpenter? I mean you could see where they went, couldn't tell what they were doing. And in this case, although you're not tracking them everywhere they go, you are tracking everything they're doing within a certain view of their own home. Yes, I think we definitely acknowledge, Judge Carson, that there is a possibility that a poll camera trained on the front of someone's home is going to see, you know, private or sensitive things. I think in this case it's kind of a good example that that is usually not going to happen. If you look at page 44 of Mr. Hayes' opening brief, he talks about the kinds of things that the camera saw here. And, you know, obviously I wouldn't have enjoyed being under this kind of surveillance myself, but what the camera saw here was essentially mundane comings and goings with familiar characters, not the kind of, you know, deeply private intimate details that the Supreme Court was concerned about in Carpenter. And in fact, if you look at, I think it's the ACLU's amicus brief here, they talk about, you know, the kinds of things that a poll camera could pick up. But what they're focused on is all about where the defendant might be going. So he might be going to a house of worship. He might be going to get medical care. That's what makes this kind of surveillance in Carpenter more sensitive than the surveillance that was undertaken here. What do you think about the press's amicus brief where they hypothesize that this could interfere, this type of ruling could interfere with their business? I mean, I think you could hypothesize that a politician might be, might suspect one of their opponents of talking to the press about them, or that maybe they think a certain reporter doesn't like them, and they want to, they want to track what they're doing. And so to defeat the anonymity of sources and such, they set up surveillance and then claim there's no privacy interest in it. What do you think about that? I wasn't too persuaded by it. Just because Mr. Hay nor his amici have identified a single instance of a poll camera being used in that kind of abusive way. Obviously, they think that poll cameras shouldn't be used in the way that they were in this case. People are creative. I mean, I just hypothesized a situation for you in which it could occur. Certainly. I don't know, the brief didn't get into like whether it's common practice for reporters or their sources to meet at their homes, which are usually what the targets of poll camera surveillance are. So I don't even know if that's necessarily a common phenomenon. But I do think that it gets at kind of a broader point, which is that there are a lot of practices that government agents and officers could engage in permissible with the Fourth Amendment, or permitted by the Fourth Amendment, that we should have concerns about. I think everybody would have concerns if, you know, the government were on a dragnet basis going around rummaging through people's trash. But the Supreme Court has made clear in California versus Greenwood that that doesn't raise a Fourth Amendment concern. It raises other concerns and it's subject to other constraints, resource constraints, potentially legal constraints, like you could have a tort action available. Agents who engage in that kind of abuse, you know, would be subject to discipline and to professional consequences. And last but not least, you know, Congress and regulators are capable of addressing these concerns as well. So Congress has repeatedly legislated in the area of personal privacy. The Department of Justice, in connection with the reporter's concern, the Department of Justice has specifically promulgated a regulation about reporter secrecy that the media organizations cite in their amicus brief. So we've exhibited a willingness to regulate in this area if necessary. So if the kind of parade of horribles that my friend raises were to arise someday, that's something that we could deal with without constitutionalizing the issue. I mean, you don't really constitutionalize something. It either is a constitutional issue or isn't, right? Yes, exactly. But we think that the decades of poll camera surveillance that have been undertaken in this area, again, without seriously undermining privacy in this country, are a very good indication, in addition to the legal principles we've been discussing, which are obviously more salient, that poll cameras do not raise Fourth Amendment concerns and that this Court's decision in Jackson should remain the law in this circuit. If there are no further questions, I'm happy to leave it there. Thank you, counsel. Thank you. I'd like to address a couple points. One, on the good faith exception, contrary to what the government just asserted, this camera actually could see inside of Mr. Hayes' home in certain instances. There is one video that was admitted and the jury did see it where Mr. Hayes pulled into his driveway at night and his wife and one of his daughters was visible through the windows of Mr. Hayes' house. And so there were times when you could see into Mr. Hayes' home. There were other times when you could see, just when he opened the front door, the small entryway into his house, although it wasn't clear. That is not something that is undisputed based on what the government just said. And Davis demands that this Court only apply the good faith exception when there is a finding appellate precedent that specifically authorizes a police practice. And here, Jackson just doesn't do that. Because the type of surveillance that was conducted in Jackson only saw a sliver of the home, we cannot say that that was the same thing. So are you having to go behind the opinion to get that? I mean, the Jackson opinion doesn't describe just seeing a sliver, does it? No, Your Honor, it doesn't. Okay, so you're going behind the opinion into what was briefed in that case. Government agents are familiar with how poll camera surveillances are conducted in this circuit. And so them relying on Jackson just because is not good enough to conduct a warrantless search of a home. And when there is ambiguity and when there is doubt about what's allowed, especially when it comes to the home, they should have sought a warrant. They never did. They never attempted to. And that should factor into this Court's analysis on whether the good faith exception applies. And also just for the Court's analysis as well, as I've already stated, Jackson was decided 23 years ago. We've had so many technological advances between the year 2000 and today. For example, Kylo talked about infrared thermal imaging that you could see inside of a house. And that's different than what we're talking about here. But then we had Hardinez, which talked about the home's curtilage and the sanctity of that. And then we had Jones, which talked about the cumulative effect of following someone around on public streets. And then we had Carpenter. So the Jackson Court did not have the benefit of all of that analysis. And despite whether this Court agrees whether good faith applies, this Court should still rule on the merits of the Fourth Amendment because of this Court's case in Dahlman. And I see that my time is up. Go ahead and wrap up your time. Thank you, Your Honor. Because of this Court's precedent in Dahlman, which states that despite whether the Court applies the good faith exception, it should not freeze Fourth Amendment protections in the year 2000. It should rule on the merits of this case because poll camera surveillance is occurring in this circuit and has been occurring in this circuit. Government agents should hear what is allowed and what is a Fourth Amendment violation. And for these reasons and for the reasons in our brief, we ask that this Court vacate the judgment below or, in the alternative, reverse and remand with instructions to clear up all of the constitutional violations and other evidentiary errors. Thank you. Thank you, counsel. Counselor, excused. We appreciate the fine arguments and the cases submitted.